# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CMS INVESTMENT HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE E. CASTLE, CAREN J. CASTLE, LEO C. STAWIARSKI, JR., THE CASTLE LAW GROUP, LLC, LCS COLORADO HOLDINGS, LLC, LEC HOLDINGS, LLC, NEXT ORGANIZATION, LLC, ASSOCIATES MANAGEMENT SERVICES,  LLC, JENNIFER WILSON-HARVEY, individually, and as personal representative of Robert M. Wilson, Jr., and WILSON & ASSOCIATES, PLLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 9468-VCP |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 16, 2015
Date Decided:  June 23, 2015

Lisa A. Schmidt, Esq., Catherine G. Dearlove, Esq., Robert L. Burns, Esq., Elizabeth A. DeFelice, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Bruce A. Featherstone, Esq., FEATHERSTONE DeSISTO LLC, Denver, Colorado; *Attorneys for Plaintiff CMS Investment Holdings, LLC*.

Seth A. Niederman, Esq., Carl D. Neff, Esq., FOX ROTHSCHILD LLP, Wilmington, Delaware; *Attorneys for Defendants Lawrence E. Castle, Caren J. Castle, The Castle Law Group, LLC, LEC Holdings, LLC, and Next Organization, LLC*.

Samuel T. Hirzel, II, Esq., PROCTOR HEYMAN LLP, Wilmington, Delaware; *Attorneys for Defendants Leo C. Stawiarski, Jr. and LCS Colorado Holdings, LLC*.

David E. Wilks, Esq., WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; *Attorneys for Defendant Associates Management Services, LLC*.

Robert A. Penza, Esq., Christopher M. Coggins, Esq., POLSINELLI PC, Wilmington, Delaware; *Attorneys for Defendants Jennifer Wilson-Harvey, individually and as personal representative of Robert M. Wilson, Jr. and Wilson & Associates, PLLC*.

**PARSONS, Vice Chancellor.**

The plaintiff in this action invested in a Delaware limited liability company ("LLC") whose business was providing non-legal administrative services to law firms and their mortgage lender clients in connection with mortgage foreclosures. That business was created by the principal defendants: five individuals who practiced law in Colorado and Arkansas. Seeking to monetize their non-legal services businesses, those individuals sold them to a Delaware LLC in 2007 in exchange for certain membership units. The plaintiff and others paid cash to acquire other membership units in that LLC. The defendants continued to run the services businesses, but now in the capacity of employees, officers, and managers of the LLC.

According to the plaintiff, the defendants, along with several of their affiliated entities, enjoyed a lucrative business. But, they failed to facilitate the LLC's collection of the administrative services fees owed to it by the law firms and clients, instead retaining the fees for themselves or paying them in improper distributions, placing the LLC in danger of defaulting on its debt obligations. The plaintiff further alleges that, instead of helping the LLC restructure and survive, the defendants purposely ushered it into insolvency. The LLC went into receivership in Colorado in 2012, and within a matter of weeks the services businesses—the main assets of the company—were sold. The buyers in the receivership sale were entities allegedly owned by the defendants.

The plaintiff charges the defendants with a litany of wrongs, including: breach of the LLC agreement, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, aiding and abetting, civil conspiracy, and fraudulent transfer. The defendants, who divided into four groups, each moved to dismiss the

1

complaint as it relates to them. In support of their motions, the defendants have raised numerous arguments in favor of dismissal, some of which overlap to a certain extent.

For the reasons set forth below, I largely deny the motions. I grant dismissal, however, of some of the claims as to certain of the eleven defendants. For example, not all of the defendants conceivably are bound by the LLC agreement, and not all owed fiduciary duties to the plaintiff. Therefore, where appropriate, I dismiss the claims for breach of contract and breach of fiduciary duty as to certain specific defendants.

## I.     BACKGROUND[1]

### A.     The Parties

Plaintiff is CMS Investment Holdings, LLC ("CMS"), a Delaware LLC. The members of CMS are CMS Corporate Holdings, Inc., a Delaware corporation, and CalPERS Corporate Partners, LLC, a Delaware LLC. Plaintiff owns 99% of the Class A Preferred Units[2] of what I referred to above as the LLC, non-party RP Holdings Group, LLC ("RPH" or the "Company"), a Delaware LLC.

---

[1]     Unless otherwise noted, the facts are drawn from the well-pled allegations of Plaintiff's Verified Amended Complaint (the "Complaint"), which is the operative pleading. Defendants submitted a joint appendix of exhibits in support of their motions to dismiss, which I cite as "Defs.' J. App., Ex. [#]." In that regard, I note that I relied only on those documents, like the relevant LLC Agreement, that are integral to the Complaint.

[2]     Capitalized terms not otherwise defined in this Memorandum Opinion are used as defined in the Third Amended and Restated Limited Liability Company Agreement of RP Holdings Group, LLC. Defs.' J. App., Ex. 2 [hereinafter the "RPH LLC Agreement"]. The Complaint incorporates the RPH LLC Agreement by reference. Compl. ¶ 43.

2

The Complaint names eleven Defendants. Defendants Lawrence E. Castle, his wife, Caren J. Castle, and Leo C. Stawiarski, Jr. are individuals residing in the State of Colorado, where all three are licensed to practice law. Defendant LEC Holdings, LLC ("LEC") is a Colorado LLC affiliated with the Castles. LEC is a party to the RPH LLC Agreement and holds Class B Common Units in RPH. Another Colorado LLC, Defendant LCS Colorado Holdings, LLC ("LCS"), affiliated with Stawiarski, is also a party to the RPH LLC Agreement and a holder of RPH Class B units. Defendant The Castle Law Group, LLC ("Castle Law Group"), formerly known as Castle Meinhold & Stawiarski, LLC, is a law firm organized as a Colorado LLC, of which the Castles and Stawiarski are managers or affiliates. Defendant Next Organization, LLC ("Next Org") is a Colorado LLC affiliated with the Castles. Next Org, Castle Law Group, LEC, and the Castles are referred to as the "Castle Defendants." LCS and Stawiarski are the "Stawiarski Defendants."

Defendant Jennifer Wilson-Harvey is an individual residing in the State of Arkansas, where she is licensed to practice law. Defendant Robert M. Wilson, who died on August 3, 2012, also practiced law in Arkansas. Wilson-Harvey, as personal representative of the Estate of Robert M. Wilson, is named as a Defendant in Wilson's place.[3] Wilson-Harvey and Wilson (the "Wilsons," and, together with the Castles and Stawiarski, the "Individual Defendants") held Class B units in RPH. At relevant times,

---

[3] For simplicity, and without intending any disrespect, this Memorandum Opinion may use "Wilson" to refer both to Mr. Wilson before August 3, 2012 and to his Estate afterward.

the Wilsons were affiliated with Defendant Wilson & Associates ("W&A"), a law firm organized as a Tennessee LLC. I refer to Wilson-Harvey, Wilson, and W&A, collectively, as the "Wilson Defendants."

Defendant Associates Management Services, LLC ("AMS") is a Delaware LLC affiliated with Wilson-Harvey.

## B. Facts

### 1. RPH's formation

The Castles, Stawiarski, and the Wilsons were attorneys who focused on providing legal services to mortgage lenders and mortgage servicing companies in connection with mortgage foreclosures and bankruptcies. The Castles and Stawiarski, primarily through Castle Law Group, operated in Colorado, New Mexico, Arizona, Nevada, Wyoming, and Utah; the Wilsons, through W&A, operated in Arkansas and Tennessee. The Individual Defendants also operated businesses related to, but formally separate from, their law firms (respectively, the "Castle Services Business" and the "Wilson Services Business," and together, the "Services Businesses"). The Services Businesses provided non-legal support services to the law firms' clients in connection with mortgage defaults, foreclosure processing, and sales of lender-owned real estate.

In 2007, the Castles and Stawiarski sought to monetize their Services Business through an outside investment, and were introduced to FTV Capital, a private equity firm. FTV Capital formed Plaintiff, CMS, as the vehicle for its investment. The investment plan called for the Castle Services Business to operate as an independent entity, which would provide non-legal or administrative services, through Castle Law Group, to

4

mortgage industry clients. If the project was successful, the independent business could offer its administrative services to other law firms and other clients. Consistent with that plan, the Castles and Stawiarski formed RPH, which acquired the Castle Services Business in exchange for certain membership units.

Plaintiff, the Castles, and Stawiarski devised an intricate structure that would enable the Castle Services Business, which would be owned by RPH, to continue servicing the law firms' clients while also protecting RPH from violating professional ethics obligations and prohibitions against the unauthorized practice of law. In that regard, RPH obtained a legal opinion from Professor Geoffrey Hazard (the "Hazard Opinion"), which stated that Castle Law Group's law practice must be separated from the Services Business. To effectuate that separation, Exclusive Services Agreements (the "Castle ESAs") were executed by Plaintiff, the Castles, Stawiarski, and Castle Law Group.[4] Pursuant to the Castle ESAs, RPH was to be the exclusive provider of the relevant non-legal services to Castle Law Group and its clients for a period of twenty-five years. This mechanism envisioned that RPH would provide non-legal services to Castle Law Group, which would bill its clients for the non-legal services provided and ultimately pass the invoiced payments through to RPH.

---

[4] RPH's counterparties in the Castle ESAs included four non-party entities apparently affiliated with the Castles' and Stawiarski's law practices. Compl. ¶ 68. Defendant Castle Law Group allegedly is the successor to at least one of those entities. *Id.* ¶ 25. For simplicity, I refer to the various law firm entities affiliated with the Castles and Stawiarski as the Castle Law Group. Any distinctions among the entities party to the ESAs are immaterial to this Memorandum Opinion.

Effective August 27, 2007, Plaintiff, RPH, and the Castle Defendants entered into several agreements, including the Castle ESAs, pursuant to which Plaintiff invested in the RPH venture (the "2007 Transactions"). The RPH LLC Agreement was amended as part of the 2007 Transactions. As relevant here, Section 4.1 provides the holders of Class A Preferred Units, such as RPH, the right to receive preferred distributions in an amount equal to the principal value of the units plus an 8% annual preferred accrual, before any distributions could be made to holders of Class B or Class C units.[5] Section 6.8 requires RPH to obtain the consent of the Class A unitholders before, among other things: amending any provision of the LLC Agreement, making distributions to RPH members or equity holders of RPH subsidiaries, transferring substantially all of the assets of RPH or its subsidiaries, or materially changing the nature of RPH's business without Board approval.[6]

Through a Securities Purchase Agreement (the "2007 SPA"), Plaintiff paid $26.9 million in cash to acquire a majority of RPH's Class A Preferred Units. The "Sellers" in the 2007 SPA included the Castles, Stawiarski, and various affiliates. Plaintiff also arranged for Freeport Financial LLC ("Freeport Financial") to make a secured loan of approximately $20 million to RPH (the "Freeport Credit Agreement"). Plaintiff alleges that the Castles and Stawiarski personally received a substantial portion of the proceeds

---

[5]     Compl. ¶ 45; RPH LLC Agreement § 4.1.

[6]     Compl. ¶ 47; RPH LLC Agreement § 6.8. As discussed *infra*, the "Board" refers to the RPH "Board of Managers."

6

from Plaintiff's $26.9 million equity investment and Freeport Financial's $20 million loan.

## 2.    RPH's initial operation and the Wilson acquisition

RPH began operating according to the structure set up in the 2007 Transactions. Shortly thereafter, at the Castles' suggestion, RPH initiated discussions with the Wilsons about acquiring their services business, which, like the Castle's, provided non-legal mortgage-related administrative services to the Wilsons' law firm clients. On April 1, 2008, RPH acquired the Wilson Services Business (the "2008 Transactions"), pursuant to a series of agreements substantially similar to those involved in the 2007 Transactions. Specifically, RPH executed another Securities Purchase Agreement to acquire more Class A Preferred units and other interests (the "2008 SPA"), and entered into an Exclusive Services Agreement with the Wilsons' law firm, W&A (the "Wilson ESA"). To finance the Wilson acquisition, Plaintiff injected another $18 million of cash into RPH, and helped arrange a $3 million increase in the Freeport Credit Agreement. Allegedly, a substantial portion of the proceeds of those investments went to the Wilsons.

Plaintiff, as Majority Holder of the Class A series units, had the right to appoint three of the five members of RPH's Board of Managers. The Class B unitholders had the right to fill the other two Board seats, and initially appointed Mr. Castle and Stawiarski. Importantly, however, the parties also agreed in connection with the 2007 Transactions to form an "Operating Board" for RPH, initially consisting of the Castles, Stawiarski, and

7

another individual.[7]  After the 2008 Transactions, Wilson and Wilson-Harvey were added to the Operating Board.  The members of the Operating Board agreed to provide services to and consult for RPH as independent contractors.  According to the Complaint, the Operating Board "was not initially expected to act in any managerial capacity on behalf of RPH."  According to Plaintiff, however, the Individual Defendants used their positions, including as members of the Operating Board, "to take effective control of RPH and to limit the information provided to Plaintiff and its designees to the Board of Managers."[8]

In this regard, it also is relevant that Mr. Castle was the CEO of RPH from 2007 through July 2009, at which time he became CEO of RPH's "West Region."  He also was Chairman of the Board of Managers until July 2011, and a member of the Board until October 2012.  Mrs. Castle co-managed the West Region.  In July 2009, Wilson-Harvey became RPH's CEO, as well as the CEO of the "South Region."[9]

### 3.  RPH struggles and Plaintiff intervenes

Shortly after the 2008 Transactions, the United States housing market declined precipitously, sending the economy into recession and causing a meltdown in U.S. and global financial markets.  What was a nightmare scenario for many, however, was a golden opportunity for RPH: as the number of residential mortgage foreclosures

---

[7]  Defs.' J. App., Ex. 8.

[8]  Compl. ¶¶ 89-90.

[9]  It appears that after it acquired the Wilson Services Businesses, RPH was divided into the West and South regions, each with a "CEO," but also retained an overall CEO of the Company.

8

skyrocketed, so did the demand for the mortgage-related administrative services that RPH was designed to offer. Consistent with that increase in foreclosure activity, RPH's business appeared to grow, at least as measured by the volume of services it was rendering to the relevant law firms and their clients. On paper, based on its use of the accrual method of accounting, RPH's profits grew too. The Complaint alleges that RPH's management, led by Castle and Wilson-Harvey, represented to Plaintiff and Plaintiff's appointed Board members that RPH was performing well, but that the structural transition to the separate-entity model, in which RPH invoiced the law firms for non-legal services, and the law firms, in turn, billed the clients, was taking time to implement and fine-tune.

According to the Complaint, the Individual Defendants in fact had been invoicing and collecting fees from the law firm clients, but diverting those funds from passing through to RPH as they should have. Castle, for example, specifically is alleged to have directed his law firm, Castle Law Group, not to pay RPH the amount prescribed by the ESAs and instead to remit some portion of the firm's profits.[10] The Wilsons allegedly took payments from clients of their law firm, W&A, that were intended to remunerate RPH for its non-legal services, and used the money to pay W&A's bills or make distributions to the Wilsons themselves, for personal expenses and perquisites.

The Individual Defendants allegedly told Plaintiff repeatedly that operational efficiency issues, combined with the turmoil in the mortgage and housing sectors, were

---

[10]     *Id*. ¶¶ 110-111.

preventing RPH from realizing positive net cash flow. Instead, RPH accumulated significant accounts receivable or "A/R" balances. Plaintiff and Plaintiff's Board appointees questioned these developments, but they allegedly were reassured repeatedly that the payors—*i.e.*, the Individual Defendants and their affiliated law firms—would make good on the A/R. Plaintiff allegedly relied on those representations, finding them plausible in light of the circumstances, especially based on the Individual Defendants' superior on-the-ground understanding of the business and their involvement in the daily management of RPH.

In April 2011, the situation had not improved, and Plaintiff's Board representatives caused RPH to engage the accounting firm of Crowe Horwath, LLP ("Crowe") to investigate and make recommendations regarding RPH's operational efficiency issues, and in particular the A/R collection processes. Due to poor record-keeping, Crowe encountered difficulties in determining how funds were being transferred in and out of RPH. Plaintiff further asserts that, as the investigation progressed, Defendants failed to cooperate fully.

In September 2011, Crowe issued a report containing its findings (the "Crowe Report"). The Crowe Report found that the Individual Defendants and their affiliated law firms had been invoicing and collecting from their clients for the cost of the services provided by RPH, but had been retaining all or part of those payments rather than paying them to RPH in accordance with the "agreed-upon schedules."[11] Crowe also discovered

---

[11] *Id.* ¶ 102.

that Castle had tampered with a management representation letter prepared for the accountants in connection with the 2010 year-end audit. Specifically, Castle deleted a representation that he previously had made to the auditors and to Plaintiff and its Board designees that the A/R would be paid.

According to Plaintiff, the Crowe Report revealed extensive wrongdoing on the part of the Individual Defendants, as well as "extensive and long-lasting efforts to conceal the true facts from Plaintiff and its representatives on the Board of Managers."[12] As an example of the affirmative actions Defendants took to misrepresent the state of RPH's affairs, Plaintiff avers that Defendants had fired RPH employees who attempted loyally to carry out the separation of the Services Businesses within the RPH entity structure, but hired and retained employees who were loyal to the Individual Defendants and assisted in their malfeasance.

#### 4.    Plaintiff tries unsuccessfully to save RPH

Plaintiff further alleges that the machinations of the Individual Defendants, and in particular Mr. Castle and the Wilsons, placed RPH in danger of engaging in the improper legal services "fee-splitting" against which the Hazard Opinion had counseled them. Equally troubling for RPH, though, was its increasing lack of liquidity. Because Defendants allegedly starved RPH of cash, RPH not only failed to make the preferred distributions as required by the RPH LLC Agreement, but also was doomed to default on its loan obligations. In January 2012, RPH failed to make an interest payment to Freeport

---

[12]    *Id.* ¶ 103.

11

Financial. RPH then owed a total of approximately $22 million on the Freeport Credit Agreement, which was secured by the Services Businesses as collateral. RPH also owed $39 million in subordinated notes, mostly held by Defendants. Most vexing was a $20 million balloon payment on the Freeport Credit Agreement that was coming due in August 2012.

In late 2011, Castle was removed as Chairman of the Board of Managers, and an outsider, Michael Bruder, was appointed CEO. Castle was directed to remove himself from RPH's offices, but he refused. Plaintiff's Board appointees and Bruder developed a proposal to restructure RPH, whereby Plaintiff and Freeport Financial each would make a $2.5 million loan, and Freeport Financial would forbear on RPH's recent loan defaults and extend the looming balloon payment. That plan would have subordinated obligations RPH owed to the Castles and the Wilsons to the new loans. Perhaps unsurprisingly, therefore, they rejected it. In March 2012, Plaintiff's Board appointees resigned from their positions in frustration. Two new Board representatives were appointed, but they quickly resigned. No restructuring plan was implemented, and by the summer of 2012, RPH's break-up "was inevitable."[13]

**5.     RPH's assets are sold in foreclosure—to the Castles and Wilson-Harvey**

RPH defaulted on the Freeport Credit Agreement in August 2012, giving Freeport Financial the right to foreclose on its collateral, including RPH's Services Businesses. Plaintiff alleges that, rather than attempt in good faith to restructure RPH's debt and save

---

[13]     *Id.* ¶ 137.

the Company, the Castles and Wilson-Harvey initiated secret negotiations with Freeport Financial, in which they sought to acquire RPH's assets in an eventual foreclosure sale. According to Plaintiff, Defendants' motivation in this regard was clear: because they had executed the ESAs, they were precluded for a twenty-five-year period from operating their Services Businesses as they had before the RPH deal.

Castle allegedly saw an "out," however: simply allow RPH to fold, thereby giving the law firms a pretext to break the ESAs.[14] The Complaint further avers that Defendants knew the Services Businesses were viable, profitable businesses, and that because the businesses depended heavily on the Castles and the Wilsons and their affiliated firms, Defendants would face little or no competition from other buyers in a foreclosure sale.

The Castles and Wilson-Harvey resigned from their positions as officers and Managers of RPH on October 15, 2012. Almost immediately thereafter, Freeport Financial filed an action for replevin and for appointment of a receiver in the District Court for the City and County of Denver, Colorado (the "Colorado Action"). That court appointed a receiver on October 23, 2012, and by November 2 the receiver had moved the court to approve the sale of RPH's West Region assets—the Castle Services Business—to "a new buyer."[15] A similar motion was filed November 19, 2012 in relation to RPH's South Region assets, the Wilson Services Business.[16] The respective

---

[14]     *Id.* ¶ 129.

[15]     Defs.' J. App., Ex. 12.

[16]     *Id.* Ex. 13.  The Colorado Action is discussed in more detail in Section III.A *infra*.

buyers as to each of these sales were Defendants Next Org and AMS. Next Org is affiliated with the Castles; AMS is affiliated with Wilson-Harvey.

Plaintiff avers that, given the timing of these events, "it is clear that Castle and Wilson-Harvey at least began to negotiate these transactions before their purported resignations," while they served as Board members and officers of RPH.[17] It is further alleged that the Individual Defendants, during negotiations with the receiver, demanded that the receiver release or "sell" to them any claims RPH may have had against them, including claims for "commercial tort actions."[18] According to Plaintiff, the "Castles and Wilson-Harvey took the position that even though such claims were not part of the Collateral for the loan, they would refuse to buy RPH's assets unless such claims were assigned to them by the receiver in connection with the repurchases."[19] The receiver accepted that condition and purported to release such commercial tort claims.[20]

The sales to Next Org and AMS became final by the end of 2012 or early 2013. Plaintiff characterizes the course of events surrounding RPH's demise and the foreclosure sale in the Colorado Action as a "self-dealing scheme." CMS contends that it enabled the Castles and Wilson-Harvey to regain control of the same businesses they sold to RPH for millions of dollars just a few years earlier, leaving Plaintiff with worthless membership

---

[17]    Compl. ¶ 146.

[18]    *Id.* ¶ 148.

[19]    *Id.*

[20]    As noted, the parties dispute the scope and validity of this purported release of claims. I discuss it in further detail *infra*.

14

units, and leaving RPH with no operating assets and almost $40 million of debt.[21]

Plaintiff alleges that the Individual Defendants' plan in or around 2012 was to "create the appearance of an independently negotiated and judicially approved sale," when in fact Defendants had negotiated in secret with Freeport Financial to buy back the Services Businesses, "with the receiver merely serving as ex post 'window dressing.'"[22]

### C.      Procedural History and Parties' Contentions

Plaintiff filed this action on March 25, 2014, and amended its complaint on August 1, 2014.  Motions to dismiss the amended complaint were filed by: (1) Stawiarski and LCS; (2) Wilson-Harvey and W&A; (3) AMS; and (4) the Castle Defendants and Next Org.  After extensive briefing, I heard argument as to the four motions (the "Motions") on January 16, 2015.[23]  This Memorandum Opinion sets forth my rulings as to the Motions.

As amended, the Complaint pleads seven counts.  Plaintiff defines the Castles, Stawiarski, the Wilsons, LEC, and LCS as the "Control Group Defendants," and charges them with breaching: the RPH LLC Agreement (Count I); the covenant of good faith and fair dealing implied in the RPH LLC Agreement (Count IV); and fiduciary duties they

---

[21]     *Id.* ¶ 141.

[22]     *Id.* ¶ 147.

[23]     Briefing in connection with the Motions was voluminous.  The Castle Defendants, the Stawiarski Defendants, the Wilson Defendants, and AMS each filed opening and reply briefs in support of their respective motions to dismiss.  The Wilson Defendants and AMS also filed a joint submission in the opening round containing their shared recitation of the relevant facts and legal standards.  Plaintiff filed a single omnibus answering brief.  I cite the various briefs as, for example, "Castle Defs.' Opening Br.," or "Pl.'s Answering Br."

15

allegedly owed to RPH and its members (Count II). Plaintiff also asserts claims against all of the Defendants for aiding and abetting breaches of fiduciary duties (Count III); civil conspiracy (Count V); unjust enrichment (Count VI); and fraudulent transfer (Count VII).

The four groups of Defendants that each separately moved to dismiss the Complaint as it pertains to them are: (1) the Castle Defendants—Lawrence and Caren Castle, LEC, Castle Law Group, and Next Org; (2) the Stawiarski Defendants—Stawiarski and LCS; (3) the Wilson Defendants—Wilson, Wilson-Harvey, and W&A; and (4) AMS. The four Defendant camps raise a plethora of arguments in favor of dismissing each of the legal and equitable theories under which Plaintiff seeks relief, resulting in a somewhat dizzying array of arguments and counter-arguments. Rather than attempt to catalog them here, I describe the important arguments in the context of the analysis below.

## II.   LEGAL STANDARD

A motion to dismiss under Court of Chancery Rule 12(b)(6) must be denied "unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible to proof."[24] In determining whether the Complaint meets this pleading standard, this Court will draw all reasonable inferences in favor of Plaintiffs and "accept all well-pleaded factual allegations in the Complaint as true."[25] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . .

---

[24]   *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[25]   *Id.*

16

draw unreasonable inferences in favor of the non-moving party."[26] In ruling on the legal sufficiency of a claim under Rule 12(b)(6), this Court "may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[27]

## III. THRESHOLD ARGUMENTS

Defendants raise several arguments that, if successful, could result in dismissal of the entire Complaint. I therefore address those arguments first. For the reasons set forth below, I do not find any of Defendants' threshold arguments persuasive.

### A. Plaintiff's Claims Are Not Derivative

Defendants assert that all of Plaintiff's asserted claims are derivative claims that can be asserted only on behalf of RPH. From that premise, they argue that Plaintiff cannot bring those claims for any one of following reasons: (1) the claims were sold as part of the Colorado Action; (2) Plaintiff is barred by *res judicata*; (3) Plaintiff has not complied with the demand requirement of Court of Chancery Rule 23.1; and (4) Plaintiff failed to join the Colorado receiver, a necessary party to this action.[28] Because I reject the foundational premise to all these arguments—that the claims asserted in this action belong to RPH and that Plaintiff only can prosecute them derivatively on RPH's behalf—

---

[26]     *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).

[27]     *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

[28]     *E.g.*, Castle Defs.' Opening Br. 9-12; Castle Defs.' Reply Br. 1-10; Wilson Defs.' Opening Br. 8-12; Wilson Defs.' Reply Br. 9-10; AMS Opening Br. 2-10; AMS Reply Br. 1-9.

17

I need not proceed further to address the merits of Defendants' subsidiary arguments in any detail.

Determining whether the claim of a stockholder or other representative is direct or derivative under Delaware law turns "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[29] If all of the stockholders (or in this case, LLC members) "are harmed and would recover *pro rata* in proportion with their ownership of the [company] solely because they are [interest holders], then the claim is derivative in nature."[30] Delaware courts "have long recognized," however, "that the same set of facts can give rise to both a direct claim and a derivative claim."[31] With those principles in mind, I consider whether Plaintiff's claims in this action are exclusively derivative claims of RPH's. If any of them are, the possibility would exist that such claim would have to be dismissed for one of the several reasons Defendants advanced.

As noted above and discussed in detail below, Plaintiff asserts seven causes of action. Those counts can be grouped usefully as follows: (1) claims for breach of the RPH LLC Agreement, as well as Plaintiff's related claims for breach of the implied covenant of good faith and fair dealing, and unjust enrichment; (2) claims for breach of

---

[29] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[30] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

[31] *Gentile v. Rossette*, 906 A.2d 91, 99 n.19 (Del. 2006) (quoting *Grimes v. Donald,* 673 A.2d 1207, 1212 (Del. 1996)).

18

fiduciary duty, as well as related claims for aiding and abetting and civil conspiracy; and (3) statutory claims for fraudulent transfer. Applying the *Tooley* analysis to Plaintiff's claims, I conclude that they are more direct than derivative in nature. At a minimum, the claims are dual claims that have both direct and derivative aspects, which would be sufficient to overcome Defendants' argument and warrant allowing Plaintiff to prosecute the direct claims it has, without regard to any hypothetical derivative claims that may exist.[32]

First, Plaintiff has direct claims for breach of contract (and related causes of action) stemming from the RPH LLC Agreement. As I discuss in more detail *infra*, one reasonable way to characterize the allegations in the Complaint is that the parties to the Agreement, including some Defendants, promised Plaintiff that Distributions[33] would be made in accordance with a specified schedule. Specifically, Plaintiff, as the Class A unitholder, had priority over the Class B and C unitholders or the recipients of Management Incentive Units with respect to allocations of RPH's free cash flows. According to the Complaint, certain Defendants used their positions within the Company to deceive Plaintiff while paying to themselves, as Class B and C unitholders and recipients of Management Incentive Units, the Distributions that should have been paid to Plaintiff. Taking those allegations as true, there may be a sense in which the Company

---

[32]  In that regard, I note that Plaintiff has represented that it seeks only to pursue its direct claims in this action. I therefore conclude that, to the extent any aspect of Plaintiff's claims could be considered partially derivative, Plaintiff has abandoned or waived such claims.

[33]  RPH LLC Agreement § 4.1.

19

was harmed, but the predominant harm fell on the Class A unitholders, including Plaintiff. That is, their contractual rights were breached. Those allegations, which I take as true at this stage, give rise to direct claims against the individuals who allegedly caused the breaches to occur.[34]

The same is true with the alleged breaches of fiduciary duties, and related claims for aiding and abetting and civil conspiracy. Under Delaware law, shares of stock and interests in non-corporate business entities "carry with them particular rights that a holder of the [interest] can exercise by virtue of being the owner."[35] Direct claims for breach of fiduciary duty arise when those rights are infringed. Moreover, even in cases involving derivative claims, the same claims can have direct aspects when the allegedly faithless transaction involves an extraction from one group of stockholders, and a redistribution to another, of "a portion of the economic value and voting power embodied in the minority interest."[36] As discussed in more detail below, the Complaint alleges that the Individual Defendants purposefully engineered the dissolution of RPH in order to disloyally purchase its only valuable assets out of receivership. Put another way, those Defendants purportedly engaged in a series of actions that culminated in the re-allocation of

---

[34] *See* Section IV.B *infra*.

[35] *In re Activision Blizzard, Inc. S'holder Litig.*, 2015 WL 2438067, at *18 (Del. Ch. May 20, 2015). In the corporate context, "[c]lassic examples" of such direct claims include suits alleging infringement of "the right to vote, the right to compel payment of a contractually specified dividend, and the right to own and alienate shares," or actions "to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL." *Id.* at *19.

[36] *Gentile*, 906 A.2d at 100.

20

economic and voting power over RPH, from a situation in which they held Class B and Class C membership units subordinate to the Class A, to one in which the Class A unitholders essentially were squeezed out for less than fair value.[37] If Plaintiff's fiduciary duty claims are proven, it is the Class A unitholders—individually, and not on a *pro rata* basis along with all the unitholders of RPH—that will be the principal recipient of any recovery. It is true that RPH also was harmed by the allegedly disloyal scheme. RPH might have (or might have had) derivative claims for those harms. That makes no difference here, however, because Plaintiff has limited the claims it is asserting based on the RPH fiduciaries' alleged breaches of fiduciary duties solely to breaches that Plaintiff can pursue directly. If Plaintiff ultimately succeeds at proving those claims, it would receive a remedy directly. Under *Tooley*, therefore, I conclude that Plaintiff has direct claims in this regard.

In arguing for a contrary conclusion, Defendants assert that the Complaint can be distilled to "a sensational story about how Defendants pillaged RPH for years causing it immeasurable harm and, as a result, Plaintiff lost its investment."[38] That may be one way

---

[37] In this regard I note again Defendants' protestations that, because Plaintiff controlled three of the five seats on RPH's Board, the sort of direct harm articulated in cases like *Gentile* cannot be present here, where Plaintiff was not a minority investor taken advantage of by a controller. That argument might prove persuasive after the factual record is developed more fully. At this time, however, taking all allegations as true and drawing reasonable inferences from them, it is conceivable that Plaintiff's ability to exert control through its Board designees and holdings of a majority of the Class A units was rendered ineffective by the misrepresentations and self-interested dealings in which Defendants allegedly engaged, while they held positions of authority at RPH.

[38] Castle Defs.' Reply Br. 4.

to read the Complaint, but it is not the only reasonable one. At this procedural stage, Plaintiff is entitled to have all reasonable inferences drawn in its favor. Viewed in the light most favorable to Plaintiff, another reasonable inference from the Complaint is that certain Defendants caused improper Distributions to be made to themselves, in violation of the promises they made to Plaintiff as parties to the RPH LLC Agreement. In addition, certain Defendants allegedly breached their fiduciary duty of loyalty by actively concealing their misconduct and by deceptively engineering a foreclosure sale in which the pre-ordained outcome was a sale of the Company's assets to themselves for less than full value. As discussed in more detail below, those theories support direct claims for breaches of contract and the implied covenant, as well as for breach of fiduciary duties and for related equitable relief. In short, for Defendants to succeed in this line of argument, they would have to show that there exist no direct claims that Plaintiff might pursue on its own. They failed to make such a showing.

AMS, which purchased RPH's South Region assets (formerly the Wilson Services Business) from the receiver, effectively devoted its entire briefing allotment to a version of this line of argument. In particular, AMS contends that actions taken in the Colorado Action preclude Plaintiff from bringing claims against AMS here. AMS's res judicata argument, which relies on a voluminous record from the Colorado Action, may or may not have merit as to the issues of whether the RPH receivership estate possessed commercial tort claims against certain individuals and entities (including some or all of the Defendants in this action), and whether the court-approved receivership sales extinguished those claims. Assuming *arguendo* that AMS's argument is sound, it is

22

conceivable that RPH's claims became part of the receivership estate, later were sold or otherwise extinguished, and now cannot be litigated in any court. That argument, however, proceeds from the necessary premise that the claims in this action *are the same claims* as those that purportedly were sold by the receiver in the Colorado proceedings, which Plaintiff strenuously disputes. It is at least reasonably conceivable that they are not. Rather, the claims brought here are direct claims that accrued to Plaintiff, not RPH. Neither AMS nor any Defendant even attempts to argue how Plaintiff's direct claims could have become part of the RPH receivership estate and thereafter been sold away.[39]

### B. Plaintiff's Claims are Not Barred by Laches

Several Defendants contend that Plaintiff's claims should be dismissed as untimely.[40] They focus on the three-year statute of limitations applicable to claims for

---

[39] *E.g.*, AMS Opening Br. 1-10; AMS Reply Br. 1-9. The first sentences of AMS's opening brief illustrate how AMS assumes the very conclusion it seeks to prove: "Plaintiff was on notice of—and indeed effectively participated through one of its two members in—proceedings in Colorado state court that properly and definitively adjudicated the claims that Plaintiff asserts against AMS here. At the urging of Calpers and others, the Colorado court found that these claims belong to the RP Holdings receivership estate." Nowhere does AMS establish how RPH's receiver could have purported to attach and take possession of property—like Plaintiff's *direct* claims, that it owns *personally—i.e.*, that was not RPH's and never was pledged as collateral for the foreclosed loan. Indeed, AMS's own brief contains statements that reveal this fatal logical gap, but makes no attempt to bridge it. *E.g.*, AMS Opening Br. 5 ("The receiver and AMS sought the court's approval of the AMS [asset purchase agreement], which transferred ownership of property belonging to the estate."). A cursory review of the filings in the Colorado action, which are beyond the Complaint but of which I take judicial notice, buttresses my conclusion in this regard. *See* Defs.' J. App., Exs. 15-24.

[40] Wilson Defs.' Opening Br. 5-7; Wilson Defs.' Reply Br. 13-14; Stawiarski Defs.' Opening Br. 19-20.

breach of contract or the implied covenant of good faith and fair dealing, unjust enrichment, and breach of fiduciary duty, and argue that each of Plaintiff's causes of action here accrued more than three years before its Complaint was filed on March 25, 2014.[41] I consider Defendants' laches argument, on its face, to be without merit. In addition, Plaintiff conceivably could show that it is entitled to the benefit of tolling, which would provide a further ground for avoiding a finding of laches here.

To determine whether an action was timely filed, this Court adheres to the doctrine of laches, the "equitable analog of the statute of limitations defense."[42] Laches analysis calls for a context-specific application of the maxim that "equity aids the vigilant, not those who slumber on their rights."[43] While there is "no hard and fast rule as to what constitutes laches," establishing the elements of the defense generally requires: (1) knowledge by the claimant; (2) unreasonable delay in bringing the claim; and (3) resulting prejudice to the defendant.[44] The defense of laches is "not ordinarily well-suited" for treatment on a Rule 12(b)(6) motion.[45] While the statute of limitations is not

---

[41] *See* 10 *Del. C.* § 8106; *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. Jan. 27), *aff'd*, 7 A.3d 485 (Del. 2010); *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011).

[42] *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015).

[43] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) (quoting 2 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE §§ 418, 419 (5th ed. 1941)).

[44] *Id.*

[45] *Id.*

24

controlling in this Court, a suit in equity generally "will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law."[46]

Based on the non-conclusory factual allegations in the Complaint, it would be inappropriate to dismiss Plaintiff's claims on laches grounds. The main reason is that Plaintiff has alleged wrongdoing that occurred well after March 25, 2011—the critical date that is three years before the filing of this action. For example, the process by which certain Defendants are alleged to have guided RPH into insolvency and then re-purchased its major assets from the receiver, which forms the basis of several of Plaintiff's claims, took place throughout 2011 and did not conclude until late 2012 or early 2013. Thus, all of the claims tied to those factual allegations, which I discuss further below, are presumptively timely as they fall within the analogous limitations period.

Even as to the alleged wrongdoing that took place before March 25, 2011, however, Plaintiff's claims cannot be dismissed on the pleadings as untimely. As discussed below, for example, Plaintiff alleges that Distributions were made in violation of the RPH LLC Agreement. Based on the alleged facts, those breaches conceivably may have begun as early as 2007 or 2008. I decline at this preliminary stage to bar Plaintiff from pursuing claims based on acts committed before March 25, 2011, however, because Delaware law allows the statute of limitations to "be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth."[47]

---

[46] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011).

[47] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).

According to the Complaint, certain Defendants, whose positions gave them credibility and superior knowledge of the day-to-day management of the RPH business, consistently lied to Plaintiff's representatives on the Board of Managers as to why the A/R balances were growing and the Company was not realizing profit, despite having a steady volume of sales.[48] In early 2011, Plaintiff engaged the Crowe firm to look into the cash flow problems at RPH. It was not until the Crowe Report came back in late 2011, however, that Plaintiff had reason to believe that managerial misconduct, rather than business efficiency issues, were in fact to blame for those problems.[49] It is reasonably conceivable, therefore, that Plaintiff could prove that the statute of limitations and any laches time period must be tolled until that time. Thus, even claims arising specifically out of conduct that occurred from 2008 to early 2011, which otherwise might be time-barred, cannot be dismissed at this preliminary stage.

Defendants further contend that Plaintiff either was or reasonably should have been aware of the problems at RPH, because of the growing A/R balances, and should have investigated the possibility of wrongdoing much earlier than it did. Defendants also emphasize that Plaintiff controlled three of the five seats on RPH's Board, giving Plaintiff "overarching control over RPH" and "superior access to information," and contend that this should negate any argument of concealment or any plea for equitable

---

[48]     *E.g.*, Compl. ¶¶ 100-109, 124-126.

[49]     *Id*.

26

tolling.[50] Plaintiff's Board appointees well may be guilty of mismanagement or negligence. That is not the issue here, however. Rather, the question is at what point they were on inquiry notice that it might not be prudent to continue relying on Defendants for information about RPH's apparently outsized A/R.

Whether one is on inquiry notice of something depends on the perception of a reasonably prudent person—*i.e.*, it is an objective standard. Determining the answer will be a fact-intensive inquiry. Thus, Defendants' argument fails based on the alleged misrepresentations and concealment by at least certain Defendants. A critical aspect of Plaintiff's allegations in this regard is that, notwithstanding its theoretical ability to exercise control over RPH, it was prevented from exercising that control effectively because of Defendants' exploitation of their superior knowledge of the Services Businesses and their positions as the lead individuals managing RPH's operations and in charge of the purported transfer of the Services Businesses into RPH. Taking all Plaintiff's allegations as true, and drawing all reasonable inferences in their favor, it is conceivable that Plaintiff's Board designees reasonably relied on the Individual Defendants' misrepresentations up until the time the Crowe Report indicated otherwise. For those reasons, I decline to dismiss any part of the Complaint on grounds of untimeliness.

---

[50] Wilson Defs.' Opening Br. 6, 7.

## C. Wilson is Properly Named a Defendant

As noted above, Robert Wilson died in August 2012, and Plaintiff seeks to name his Estate as a Defendant in his place. On August 11, 2012, notice was provided pursuant to Arkansas law to creditors of the Estate that all claims against the Estate would be barred if not filed within six months of that date. The Wilson Defendants contend that all Plaintiff's claims against Wilson or his Estate are barred because this action was commenced more than a year after that cut-off.[51] Plaintiff responds that, under the statute the Wilson Defendants cite as support for their argument in this regard, "known or reasonably ascertainable" creditors are entitled to either "actual notice" from the Estate or to have the statutory period enlarged from six months to two years.[52] Plaintiff asserts that it received no such notice, and that this action was filed against Wilson less than two years after the Estate first gave notice. The Wilson Defendants largely fail to counter this argument.[53]

On a more complete record, the Wilson Defendants may be able to demonstrate that Plaintiff was not entitled to actual notice under the statute, that such notice properly

---

[51] Wilson Defs.' Opening Br. 4.

[52] Pl.'s Answering Br. 80 (citing Ark. Code Ann. § 28-50-101(h) (2014)).

[53] Wilson Defs.' Reply Br. 14-15. Since the argument on the Motions, the Wilson Defendants have apprised this Court of certain developments in an action relating to Wilson's Estate pending in Arkansas state court, in which the court ruled that CMS's claims against Wilson's Estate were untimely. *See* Docket Item ["D.I."] No. 102. Because CMS has appealed that order, however, I decline at this relatively early stage of the case to accord that ruling any preclusive effect here. *See* D.I. No. 103 (Plaintiff's response to the Wilson Defendants' letter of May 21, 2015, citing relevant authorities as to the preclusive effect of orders subject to pending appeals, including *Restatement (Second) of Judgments* § 13 cmt.f (1982)).

28

was provided, or that the Arkansas court's ruling is entitled to preclusive effect. At this motion to dismiss stage, however, I find that the Wilson Defendants have not shown sufficient grounds for dismissing Wilson's Estate from this case entirely.

## IV. COUNTS I, IV, AND VI

In Counts I, IV, and VI, Plaintiff purports to state claims for breach of the RPH LLC Agreement, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. The contract and implied covenant claims are leveled against the Control Group Defendants only. Plaintiff charges all Defendants with unjust enrichment.

### A. Relevant Provisions of the RPH LLC Agreement

Plaintiff contends that it adequately has pled breaches of Sections 4.1, 6.8, 5.1, and 14.3 of the RPH LLC Agreement. Section 4.1 governs Distributions. It requires that Distributions, meaning any disbursements of cash or property from the Company to a Member, must be made in accordance with the priority schedule it sets forth: first to pay the Class A Preferred Unitholders' yield, then to the same holders for returns of capital, then to the Class B Common Unitholders, and finally to pay Management Incentive Units, which were to be paid by the Company in the form of Class C Common Units.[54] As relevant here, the RPH Board had the authority to approve Distributions of Management Incentive Units, but the Castle Continuing Member Affiliates and the Wilson Continuing Member Affiliates had the discretion to determine which specific employees, officers, or other individuals would receive the approved Management

---

[54] RPH LLC Agreement § 4(a); *see also id.* Art. I (defining all capitalized terms, including "Distributions"); *id*. § 3.6 (concerning Management Incentive Units).

Incentive Units.[55] The "Castle Continuing Member Affiliates" and "Wilson Continuing Member Affiliates" consisted of any Castle and Wilson "Member Affiliates" who were "providing services to the Company or serving as a member of the Operating Board."[56] The Castle Member Affiliates included the Castles and Stawiarski; the Wilson Member Affiliates included Wilson and Wilson-Harvey.[57]

Section 6.8 identifies certain actions the Company could not take without the consent of the Class A Preferred Unitholders. Those actions included: entering into "any agreement or arrangement with any officer, director, Manager or Member, any relative thereof, or any Affiliate"; or materially changing "the nature of the business of the Company."[58] Section 5.1 vests in the Board "all management powers over the business and affairs" of RPH.[59] Section 14.3 provides that RPH assets shall be owned by the Company, and "no Member, individually or collectively, shall have any ownership interest" in any Company asset.[60]

Section 5.7 of the RPH LLC Agreement contains a Limitation of Liability. In particular, it states that:

---

[55]     *Id*. § 3.6(a).

[56]     *Id*.

[57]     *Id.* Art. I.

[58]     *Id*. § 6.8(h)-(j).

[59]     *Id*. § 5.1(a).

[60]     *Id*. § 14.3.

Except as otherwise provided herein or in an agreement entered into by such Person and the Company, no Manager or any of such Manager's Affiliates shall be liable to the Company or to any Member for any act or omission performed or omitted by such Manager in its capacity as a member of the Board pursuant to authority granted to such Person by this Agreement; provided that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's gross negligence, willful misconduct or knowing violation of law or for any present or future breaches of any representations, warranties or covenants by such Person or its Affiliates contained herein or in the other agreements with the Company.[61]

The Agreement broadly defines "Person" as including any individual or entities, and "Affiliate" as a Person that directly or indirectly "controls or is controlled by, or is under common control with," another specified Person.[62]

The operative version of the RPH LLC Agreement was executed February 1, 2010 by RPH and its Members.[63] A schedule attached to the Agreement identifies the Members and their unit holdings. In addition to Plaintiff, Defendants LEC, LCS, Wilson, and Wilson-Harvey signed the Agreement as Members of RPH.

## B. Plaintiff States Claims for Breach of Contract Against Some Defendants

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the

---

[61] *Id*. § 5.7(a).

[62] *Id*. Art. I.

[63] *Id*. Recitals. The operative agreement is the Third Amended and Restated Limited Liability Company Agreement of RP Holdings, Inc.

resultant damage to the plaintiff."[64]  At the pleadings stage, dismissal of a claim for breach of contract "is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[65]

### 1.    The Castle Defendants

The Castle Defendants seek dismissal of Plaintiff's breach of contract claims on the ground that the Castles are not parties to the RPH LLC Agreement, and therefore cannot be liable for any alleged breaches thereof.  Because the contract claims relate to LEC, the Castle Defendants also contend that all the alleged breaches are barred by the limitation of liability in Section 5.7 of the Agreement.[66]  Their first argument is partially correct, in that not all the Castle Defendants are bound by the Agreement.  The second argument, however, is unpersuasive.

First, it is not reasonably conceivable that Plaintiff will be able to demonstrate that all of the Castle Defendants are liable for breaches of the RPH LLC Agreement.  Under Delaware law, "only a party to a contract may be sued for breach of that contract."[67]  The Castle Defendants concede that as a Member of the Company and signatory of the RPH LLC Agreement, LEC is bound by its terms.  But, LEC is not the only Castle Defendant who conceivably may be bound by the Agreement.  Lawrence Castle was at relevant

---

[64]     *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)

[65]     *Id.* at 615.

[66]     Castle Defs.' Opening Br. 12-15.  The Castle Defendants did not challenge the enforceability of the RPH LLC Agreement against Next Org.

[67]     *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002).

32

times a member of RPH's Board. Therefore, he is bound by the Agreement regardless of the fact that he personally did not execute it.[68]

Whether Caren Castle is bound by the RPH LLC Agreement, however, is a closer question. Unlike Lawrence, Caren Castle was not a member of RPH's Board, although she was an Operating Board Member[69] and held a high-level position in the Company. Plaintiff also avers that Caren Castle "held substantial membership interests in RPH, indirectly, through various entities."[70] Even assuming the truth of those allegations, as I must at this stage, I cannot find that they support a reasonable inference that Caren Castle conceivably could be liable to Plaintiff for breach of the RPH LLC Agreement. The first element of proof that an enforceable contract exists between two parties requires allegations sufficient to prove that the parties intended to be bound. Under Delaware law, courts look to objective manifestations of the parties' intent to determine whether they undertook any contractual obligations.[71] Nothing in the Complaint, the RPH LLC Agreement, Caren Castle's Operating Board Member Agreement, or any of the other

---

[68] Compl. ¶ 21; *see* 6 *Del. C.* § 18-101(7) ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement.").

[69] Defs.' J. App., Ex. 8.B.

[70] Pl.'s Answering Br. 24 n.4; Compl. ¶ 24.

[71] *See, e.g.*, *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012); *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971); *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *16 (Del. Ch. Sept. 30, 2014).

33

documents in the record support a reasonable inference that she intended to be bound by the terms of the RPH LLC Agreement.[72]

Furthermore, Delaware does not recognize a cause of action for aiding and abetting a breach of contract.[73] I therefore reject Plaintiff's conclusory attempt to widen the scope of its breach of contract claim by using defined terms such as "Control Group Defendants" or by lumping together all entities and persons affiliated with LEC and Lawrence Castle, instead of pleading, as it must, non-conclusory facts supporting a reasonable inference that each of the named Defendants undertook contractual

---

[72] I decline Plaintiff's invitation to infer that Caren Castle could be bound by the RPH LLC Agreement merely because she allegedly holds interests in LEC, which is a Member of RPH and therefore a party to the contract. Plaintiff effectively asks the Court to disregard LEC's separate legal identity and hold that one of its alleged interestholders could be liable for contractual breaches it committed. Yet, Plaintiff has failed to allege sufficient facts to support such a piercing of the corporate veil. *See Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

[73] *See, e.g.*, *Allen v. El Paso Pipeline GP Co.*, 2014 WL 8266199, at *22 (Del. Ch. June 20, 2014) (citing *Gotham P'rs, L.P.*, 817 A.2d at 172), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015); *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013). I note, however, that "[b]ecause the alternative entity statutes permit the entity's governing agreement to modify, alter, or expand fiduciary duties, there are situations involving alternative entities where a party could owe fiduciary duties, the scope of the fiduciary duty would be established by contract, and a third party could aid and abet a breach of the contractually measured fiduciary duty." *Allen*, 2014 WL 8266199, at *22. Notwithstanding the analytical overlap between breach of contract and breach of "contractual" fiduciary duty claims in the alternative entity context, those are distinct causes of action, and secondary liability in the form of aiding and abetting can lie only as to the latter. *Id*. at *23; *see also Gerber*, 2013 WL 209658, at *11 (dismissing claims for aiding and abetting breaches of a limited partnership agreement because the predicate breaches sounded in contract, not fiduciary duty). I discuss *infra* whether Plaintiff adequately has stated claims for breach of fiduciary duty and for aiding and abetting such breaches.

obligations to Plaintiff and later breached them. Thus, I conclude that Count I must be dismissed as it relates to Caren Castle.

LEC and Lawrence Castle, however, are bound by the RPH LLC Agreement, and the Complaint adequately pleads that they each breached certain provisions of the Agreement. For example, Plaintiff alleges that the priority of Distributions agreed to in Section 4.1 essentially was turned upside down, as the revenues due to RPH were directed to the Company's managers and officers and their affiliated law firms, while the Class A Preferred Unitholders at the top of Section 4.1's priority schedule received nothing. Lawrence Castle specifically is alleged to have orchestrated that aspect of the wrongdoing, to the detriment of RPH and the benefit of his law firm, Castle Law Group.[74] The Distributions under Section 4.1 are within the authority of the RPH Board, of which Castle was Chairman. Thus, assuming the truth of the allegations, it is reasonably conceivable that Castle was a cause of their being made, and therefore, he could be liable to Plaintiff for at least that breach of contract.

It also is reasonably conceivable that LEC violated Section 4.1 of the Agreement, because as a Class B Unitholder, it too was supposed to receive Distributions only after the requisite Class A payments were made. At this preliminary stage, drawing all reasonable inferences in favor of Plaintiff, I find it conceivable that LEC could be in breach of this provision, if it knowingly accepted Distributions in violation of the Section 4.1 priority schedule due to its collusion with Castle. For at least these reasons—and,

---

[74] Compl. ¶ 110; *see also id*. ¶¶ 114-121.

perhaps more, based on the other alleged breaches of the Agreement—I deny the motion to dismiss Plaintiff's breach of contract claim as to either Lawrence Castle or LEC.[75]

## 2. The Stawiarski Defendants

Like the Castle Defendants, Stawiarski and LCS contend that the breach of contract claims against them must be dismissed because they are exculpated from liability under Section 5.7 of the RPH LLC Agreement. Stawiarski and LCS also argue that the Complaint fails to allege how they participated in the alleged wrongdoing, apart from lumping them together with the Castles and the Wilsons through broadly defined terms such as "Defendants" and "Control Group Defendants." Their argument in this regard focuses particularly on two facts: first, that Stawiarski resigned from RPH's Board of Managers in January 2012 and took no part in Defendants' alleged plot to drive RPH into insolvency and repurchase its assets out of receivership; and second, that Stawiarski's involvement on the Operating Board—the group to which Plaintiff attributes many of its allegations of wrongdoing—was significantly less than that of the Castles or the Wilsons.[76]

---

[75] The Castle Defendants also contend that the Complaint fails to state claims for breach of the RPH LLC Agreement as to any of them based on the exculpation provision in Section 5.7. That argument is without merit. The parties to that Agreement contracted for limited liability, "provided that . . . such limitation of liability shall not apply" in cases of gross negligence or intentional wrongdoing, "or for any present or future breaches of any representations, warranties or covenants by such Person or its Affiliates contained herein . . . ." RPH LLC Agreement § 5.7(a). The Complaint alleges, in a non-conclusory manner, intentional wrongdoing by the Castle Defendants.

[76] Compl. ¶ 23.

36

Initially, I note that both Stawiarski and LCS are Members of RPH, and neither denies that they are both bound by the Agreement. Like Lawrence Castle, Stawiarski was a member of both the RPH Board and the Operating Board that allegedly performed most of the day-to-day functions of RPH. As discussed above, the Complaint avers that during the time period that Stawiarski was on the Board and the Operating Board, material breaches of the RPH LLC Agreement were committed, including Distributions in violation of Section 4.1.

As with Castle and LEC, one reasonably could infer that Stawiarski was involved in the payment of those Distributions and benefited from them, to the extent that his law firm received monies that rightfully should have been paid to the Class A Preferred Unitholders. Similarly, because both Stawiarski and LCS held Class B units, to the extent they knowingly accepted improper Distributions or colluded with the Castles to facilitate their payment, it is reasonably conceivable that they breached Section 4.1 of the Agreement. While there ultimately might be merit to Stawiarski and LCS's position that it was the Castles and the Wilsons who were truly behind all the alleged wrongdoing, and Stawiarski is a victim of alleged guilt by association, I cannot conclude at the motion to dismiss stage that there is no conceivable set of facts under which Stawiarski and LCS would be liable for breach of the RPH LLC Agreement. Accordingly, I deny their motion to dismiss as to Count I.

### 3. The Wilson Defendants

The Wilson Defendants concede that the Wilsons are parties to the RPH LLC Agreement. They contend, however, that the breach of contract claims against them must

be dismissed under Rule 12(b)(6). Their primary contention is that the Wilsons cannot have breached any of the sections upon which Plaintiff bases its breach of contract claim, because those sections contain obligations binding the RPH Board, rather than obligations the Wilsons owe to Plaintiff. According to the Wilson Defendants, Plaintiff's complaints in this regard boil down to allegations that funds wrongly were diverted from RPH to the Wilsons' law firm, W&A, and that even assuming that were true, no claim for breach of the RPH LLC Agreement would lie against any of the Wilson Defendants.

For similar reasons to those supporting the breach of contract claims against the Castles and Stawiarski, I conclude that the contract claims against the Wilsons are well-pled.[77] As Members of RPH and parties to the RPH LLC Agreement, they were bound not to take actions that would result in a breach of one of its provisions. Among other alleged breaches, Plaintiff alleges that Wilson-Harvey, as CEO of RPH and a member of the Operating Board, took actions that resulted in improper Distributions being made to members of management (including herself) and other unitholders in violation of Section 4.1.[78] Wilson also was a member of the Operating Board when the wrongful Distributions are alleged to have occurred. While neither Wilson-Harvey nor Wilson were on the RPH Board of Managers, I nevertheless conclude, based on the factual

---

[77] I refer to the Wilsons advisedly, rather than the Wilson Defendants. The Wilson Defendants include W&A, which is not a party to the RPH LLC Agreement. Apart from general references to the Wilson Defendants, however, the Complaint provides no basis for a breach of contract claim against W&A. As to W&A, therefore, Defendants' motion to dismiss this count is well-founded.

[78] *E.g.*, Compl. ¶¶ 111-115.

allegations in the Complaint, that their position of influence in the operational structure of RPH makes it reasonably conceivable that they caused improper payments to be made, or fees to be misdirected into their own coffers instead of RPH's, in violation of at least Section 4.1 of the Agreement. Therefore, I deny the Wilsons' motion to dismiss the breach of contract claims against them.

### 4. AMS

AMS was not a Member of RPH, and Plaintiff makes no effort to explain why it would be bound by the RPH LLC Agreement. All of the allegations concerning AMS pertain to the later time period during which RPH was rendered insolvent and the receiver sold its assets to AMS and Next Org. Based on the lack of specific allegations or arguments linking AMS to the Agreement, I conclude it is not reasonably conceivable that AMS would be liable to Plaintiff for any breach of that contract asserted in the Complaint.

### C. Plaintiff States Claims for Breach of the Implied Covenant Against Some Defendants

In Count IV, Plaintiff charges the Control Group Defendants—the Castles, LEC, Stawiarski, LCS, and the Wilsons—with breaching the implied covenant of good faith and fair dealing. All those Defendants seek dismissal of this claim. Because the Complaint alleges that all but one of these Defendants breached a specific term that is implicit in the RPH LLC Agreement and thereby harmed Plaintiff, I largely deny this aspect of the Motions.

The implied covenant of good faith and fair dealing "attaches to every contract," and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[79] Nevertheless, "Delaware law requires that the contract's express terms be honored, and prevents a party who has after-the-fact regrets from using the implied covenant of good faith and fair dealing to obtain in court what it could not get at the bargaining table."[80] Analysis of an implied covenant claim hinges on "inferring contractual terms to handle developments or contractual gaps" that neither party anticipated, so the implied covenant cannot apply when the contract addresses the conduct at issue.[81] Thus, to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege "a specific obligation implied in the contract, a breach of that obligation, and resulting damages."[82] This Court cannot invoke an implied covenant, however, "to re-write the agreement between the parties, and

---

[79] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.,* 498 A.2d 151, 159 (Del. Ch. 1985)); *see also Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015).

[80] *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 881 (Del. 2015).

[81] *Id*. at 896 (quotation marks omitted) (quoting *Nemec v. Shrader,* 991 A.2d 1120, 1125 (Del. 2010)).

[82] *Fortis Advisors LLC*, 2015 WL 401371, at *3.

'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[83]

As a threshold matter, I note that, because I found that she was not a party to the RPH LLC Agreement, Caren Castle cannot conceivably be liable for breach of the covenant of good faith and fair dealing implicit in that contract. As a non-party, she is not bound by the terms of the Agreement, express or implied. As to the Defendants who are parties to the RPH LLC Agreement, however, Plaintiff adequately has stated claims for breach of the implied covenant. The Complaint supports a reasonable inference that the underlying purpose of the Agreement was to create an operational structure that would enable the parties to separate the Services Businesses from Defendants' law firm businesses. It is further inferable that compliance with the Hazard Opinion, on which Plaintiff alleges Defendants knew it relied in entering into the 2007 and 2008 Transactions,[84] was an implied term in the parties' Agreement. Plaintiff avers that the Hazard Opinion outlined the need for the separate-entity structure so that the parties could conduct their contemplated business without risking a violation of legal ethics rules or engaging in the unauthorized practice of law. Thus, I find it conceivable that Plaintiff

---

[83] *Nationwide Emerging Managers, LLC*, 112 A.3d at 897 (quoting *Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006)).

[84] In connection with the 2008 Transactions, the parties obtained another legal opinion from Adams & Reese, LLP that was similar in substance to the Hazard Opinion, but focused on the Wilson Services Businesses rather than the Castle Services Businesses. Compl. ¶ 76. For the sake of simplicity, I refer only to the Hazard Opinion because the parties did not identify any material distinction between that and the later opinion.

will be able to show that adherence to the strictures embodied in the Hazard Opinion, which the Complaint alleges the parties were cognizant of when they executed the RPH LLC Agreement, was an implied term of the Agreement.[85]

Defendants allegedly made no attempt, however, to transfer the Services Businesses into RPH and maintain the separation contemplated by the Hazard Opinion as that implied term required. Rather, they took the tens of millions of dollars Plaintiff paid in connection with the 2007 and 2008 Transactions and largely continued doing business the way they had been doing it, with the Individual Defendants and their law firms directly or indirectly receiving the relevant fees and RPH accruing what ultimately proved to be relatively worthless A/R balances. By so doing, Defendants are alleged to have frustrated the basic purpose of the RPH LLC Agreement, as reflected in the Hazard Opinion, on which all the parties allegedly relied at the time of contractual formation. Taking all facts in the Complaint as true and drawing all reasonable inferences from them, I find that those Defendants who are parties to the RPH LLC Agreement conceivably could be liable to Plaintiff for breach of the implied covenant of good faith and fair dealing.[86]

---

[85] In analyzing an implied covenant claim, "[t]he temporal focus is critical." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del.), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). Thus, the court must focus on "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.*

[86] *See Gerber*, 67 A.3d at 422 (holding that an implied covenant claim adequately was stated because the defendants used a fairness opinion that "did not fulfill its basic function," an eventuality that plaintiff could not have anticipated at the time of contractual formation).

In arguing for a contrary conclusion, the Castle Defendants and the Wilsons contend that the implied covenant claim fails because neither the RPH LLC Agreement nor any of the other written agreements refer either to the Hazard Opinion, or to the separation of the Services Businesses that Plaintiff suggests was critical to an underlying purpose of the parties' bargain.[87] That argument is unpersuasive. The implied covenant of good faith and fair dealing is, by definition, implied—that is, it is "[n]ot directly expressed," or "[r]ecognized by law as existing inferentially."[88] The Complaint alleges that, at the time the relevant parties entered into the RPH LLC Agreement, they shared an understanding that the Services Businesses would operate separately from the law firms, as envisioned in the Hazard Opinion, but that the Individual Defendants later deviated from that implicit aspect of the Agreement. Thus, the allegations in the Complaint support a reasonable inference that the Defendants with whom Plaintiff entered into the Agreement "'frustrate[d] the overarching purpose of the contract by taking advantage of [their] position[s] to control implementation of the agreement's terms.'"[89] Accordingly,

---

[87] Castle Defs.' Opening Br. 22 ("[I]t is unreasonable, as a matter of law, to read into the Agreement an implied promise based upon the Hazard Opinion. While described in Plaintiff's pleading . . . it is nowhere mentioned or incorporated into any applicable contract."); Wilson Defs.' Opening Br. 26 ("Plaintiff fails to allege how the Opinion was an 'implied' obligation of the LLC Agreement and how it was breached. Neither the LLC Agreement nor the SPA references the Opinion or its underlying purpose."). Stawiarski joins in this argument.

[88] BLACK'S LAW DICTIONARY 770 (8th ed. 2004) (defining "implied").

[89] *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

43

at this initial stage and in light of the near-cursory counterarguments actually advanced by Defendants, a sufficient claim for breach of the implied covenant of good faith and fair dealing has been stated as to all of the Defendants who are party to the Agreement.

### D. Plaintiff States Claims for Unjust Enrichment

Unjust enrichment is the "'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[90] Unjust enrichment, or "quasi-contract," developed "as a theory of recovery to remedy the absence of a formal contract."[91] "When the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed,"[92] because the "contract is the measure of plaintiffs' right."[93] Nevertheless, as with the implied covenant of good faith and fair dealing, it is not unusual for plaintiffs to attempt to supplement claims for breach of contract with additional claims for unjust enrichment, generally as a hedge against the possibility that the court might conclude that there was no formal contract between the parties. There are five elements to an unjust enrichment claim under Delaware law: "(1) an enrichment, (2) an impoverishment, (3) a relation between the

---

[90] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891-92 (Del. Ch. 2009) (quoting *Schock v. Nash,* 732 A.2d 217, 232 (Del. 1999)).

[91] *Choupak v. Rivkin*, 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015).

[92] *Kuroda*, 971 A.2d at 891.

[93] *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979).

44

enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[94]

With the exception of Caren Castle, the substance of this claim arguably is duplicative of Plaintiff's well-pled claims for breach of contract and of the implied covenant of good faith and fair dealing. If the alleged wrongs underlying Plaintiff's unjust enrichment claim related solely to the same allegations as the contract and implied covenant claims, this Count might be susceptible to dismissal.[95] Plaintiff contends, however, that it has stated a claim for unjust enrichment because of its allegations that "Defendants, through their breaches of fiduciary duty, self-dealing conduct, and otherwise inequitable behavior, sold the Services Businesses to RPH for tens of millions of dollars, then unfairly and unlawfully paid RPH less than it was entitled to" and instead retained the benefit for themselves.[96] The Court of Chancery Rules permit alternative pleading, and Plaintiff's unjust enrichment claim conceivably might proceed in tandem with any well-pled claim for breach of fiduciary duty that it may have.[97] Because, as discussed *infra*, Plaintiff has stated claims for breaches of fiduciary duties, and points to

---

[94] *Calma ex rel. Citrix Sys., Inc. v. Templeton*, --- A.3d ---, 2015 WL 2265535, at *20 (Del. Ch. Apr. 30, 2015) (quotation marks omitted) (quoting *Nemec*, 991 A.2d at 1130)).

[95] *Kuroda*, 971 A.2d at 891; *Wood*, 401 A.2d at 942.

[96] Pl.'s Answering Br. 69.

[97] *See, e.g.*, *Calma*, 2015 WL 2265535, at *20. The right to plead in the alternative, however, "does not obviate the need to provide factual support for each theory." *Fortis Advisors LLC*, 2015 WL 401371, at *5 (internal quotation omitted).

45

the alleged facts underlying those claims as supporting the unjust enrichment claim,[98] I decline to dismiss the claim for unjust enrichment at this procedural stage.

## V.        COUNTS II, III, AND V

In Count II, Plaintiff charges the Control Group Defendants—the Castles, LEC, Stawiarski, LCS, and the Wilsons—with breaching fiduciary duties owed to RPH and its Members. Plaintiff also brings claims against all Defendants in Count III for aiding and abetting the alleged breaches of fiduciary duty. In a related vein, Count V accuses all Defendants of engaging in a civil conspiracy.

The Castle Defendants seek dismissal of Counts II, III, and V as they relate to them, contending that Plaintiff's claims are subsumed by the parties' express contracts, and, in any case, the Complaint fails to allege violations of either the duty of care or the duty of loyalty.[99] The Wilson Defendants make essentially the same arguments.[100] The Stawiarski Defendants join in the arguments of the Castle and Wilson Defendants, but also contend, as with the breach of contract claims, that the Complaint lacks specific allegations regarding what actions Stawiarski took in violation of any fiduciary duties.[101] None of these arguments are persuasive. Plaintiff has stated claims for breach of fiduciary duty against each of the Defendants that conceivably might owe such duties to

---

[98]     Pl.'s Answering Br. 70.

[99]     Castle Defs.' Opening Br. 8-18.

[100]     Wilson Defs.' Opening Br. 8-19; AMS Opening Br. 1.

[101]     Stawiarski Defs.' Opening Br. 18-21.

RPH and Plaintiff. Plaintiff also has stated claims for aiding and abetting breaches of fiduciary duty as to certain other Defendants.

## A. Plaintiff States Claims for Breach of Fiduciary Duty

### 1. Legal Standards

"In the absence of language in an LLC agreement to the contrary, the managers of an LLC owe traditional fiduciary duties of care and loyalty."[102] Because the limitation of liability contained in Section 5.7 of the RPH LLC Agreement does "not apply to the extent the act or omission was attributable to such Person's gross negligence, willful misconduct or knowing violation of law," I conclude that the Agreement does not diminish the default standards of care and loyalty under Delaware law.[103] None of the Defendants dispute this point. Thus, the relevant inquiry in determining whether Plaintiff has stated claims for breach of fiduciary duty is whether it is reasonably conceivable based on the non-conclusory allegations in the Complaint that one or more Defendants breached the duties of care and loyalty they owed to RPH and its Members.

---

[102] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *11 (Del. Ch. Apr. 21, 2015); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 (Del. Ch. 2012); *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 850 (Del. Ch.), *aff'd sub nom. Auriga Capital Corp. v. Gatz Props., LLC*, 59 A.3d 1206 (Del. 2012); 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern.").

[103] *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006) ("[A] lack of due care [is] fiduciary action taken solely by reason of gross negligence and without any malevolent intent.").

## 2.     Which Defendants Owe Fiduciary Duties to RPH and Plaintiff?

Before reaching the question of whether the Complaint contains well-pled allegations of breaches of fiduciary duty, I first must determine which Defendants conceivably might have owed fiduciary duties to RPH and Plaintiff. Delaware law is clear that, "[u]nder traditional principles of equity, a manager of an LLC would qualify as a fiduciary of that LLC and its members."[104] This Court has held that an LLC manager owes fiduciary duties because it has "more than an arms-length, contractual relationship with the members of the LLC," and "is vested with discretionary power to manage the business of the LLC."[105] The corollary of that proposition, however, is that while managers and managing members owe default fiduciary duties, "passive members do not," absent a modification of the LLC agreement or facts suggesting that the purportedly passive member was acting in a managerial capacity.[106]

With those principles in mind, I conclude that, as members of RPH's Board of Managers, Lawrence Castle and Stawiarski owed fiduciary duties to RPH and its Members. The situation is somewhat less clear, however, as to Caren Castle and the

---

[104]     *Auriga Capital Corp.*, 40 A.3d at 850 (emphasis added).

[105]     *Id*. at 850-51.

[106]     *Feeley*, 62 A.3d at 662 (discussing the analogous provisions of the Delaware Revised Uniform Limited Partnership Act, and concluding that, "For Section 17–1101(d) to say that fiduciary duties can be restricted or eliminated '[t]o the extent that . . . a partner or other person' owes fiduciary duties acknowledges these situationally specific possibilities and recognizes that epistemological questions about the extent to which a partner or other person owes duties will be answered by the role being played, the relationship to the entity, and the facts of the case. The same is true for the LLC Act.")

48

Wilsons. During the relevant time period, Wilson-Harvey was the CEO of RPH, and Caren Castle was a high level officer of the Company and CEO of the West Region. Based on those alleged facts, I find it reasonably conceivable that each of those two Defendants stood in the position of a fiduciary to RPH and its Members. Indeed, none of the Castles, Stawiarski, or Wilson-Harvey seriously contest that they owed fiduciary duties in this regard.

As to Wilson, however, the Wilson Defendants deny that he had a fiduciary relationship to Plaintiff, because he merely was a member of the Operating Board, not RPH's "real" Board of Managers.[107] While there ultimately may be merit to this position, at the motion to dismiss stage, taking all alleged facts as true and drawing reasonable inferences in favor of Plaintiff, I conclude that, while he was involved with RPH as a Member, Wilson conceivably did owe fiduciary duties to RPH and to Plaintiff. Wilson, along with Wilson-Harvey, was responsible for running the South region operations of RPH. The level of knowledge and control Wilson allegedly had over RPH's business in that regard supports a reasonable inference that he was "vested with discretionary power to manage the business of the LLC."[108] It also is possible that, after all the evidence is in, Wilson will be found merely to have had a contractual relationship with RPH or Plaintiff as an Operating Board member. Based on the non-conclusory allegations in the Complaint, however, it is conceivable that Wilson had "more than an arms-length,

---

[107] Wilson Defs.' Opening Br. 12-13.

[108] *Auriga Capital Corp.*, 40 A.3d at 850.

49

contractual relationship with the members of the LLC," and therefore may be found to have owed fiduciary duties to them.[109]

Plaintiff also attempts to plead claims for breach of fiduciary duty against LEC and LCS, the only business entities among the Control Group Defendants. As a general matter, corporations and other business entities can owe fiduciary duties, as most easily exemplified in the situation where a corporation, LLC, or other entity is the managing member of an LLC or the general partner of a limited partnership.[110] In this case, however, LEC and LCS are not managing members of RPH. And, unlike the Individual Defendants, LEC and LCS are not alleged to have occupied a position in which they exercised control over the business and affairs of the Company, such that they conceivably could owe fiduciary duties to RPH and its Members on that basis. To state a cognizable claim for breach of fiduciary duty against LEC and LCS, Plaintiff must do more than merely including them in a defined category such as Control Group Defendants. Based on the lack of factual allegations that could support a reasonable inference that either entity owed fiduciary duties to RPH and its Members, I therefore find that Count II must be dismissed as to Defendants LEC and LCS.

---

[109] *Id.*

[110] *E.g.*, *Feeley*, 62 A.3d at 663; *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991).

### 3. Has Plaintiff Stated Claims for Breaches of Fiduciary Duty against the Defendant Fiduciaries?

As to the Castles, Stawiarski, and the Wilsons, all of whom conceivably could be found to have owed fiduciary duties to RPH and its Members, I find that the Complaint adequately pleads claims for breach of those fiduciary duties. Plaintiff has alleged non-conclusory facts that support a reasonable inference that each of the Individual Defendants breached the duty of loyalty and possibly also the duty of care. As to the Castles and the Wilsons,[111] without addressing other alleged wrongdoing that might implicate their fiduciary duties, I focus on one of the most egregious allegations in the Complaint: that, beginning in late 2011 and continuing until late 2012, they purposefully took actions to block RPH from receiving much-needed debt refinancing, facilitated the Company's decline into insolvency, secretly negotiated with its creditors, and then, through Next Org and AMS, purchased on favorable terms the Services Businesses back from RPH in receivership.[112] At this motion to dismiss stage, I take those allegations as

---

[111]    I note that Wilson died in August 2012, before the alleged plot to drive RPH into insolvency and then repurchase its assets came to fruition. It may turn out, therefore, that only Wilson-Harvey, and not Wilson, would be liable to Plaintiff for breaches of her fiduciary duties in connection with those specific allegations. The Complaint alleges, however, that Wilson took part in this process before his death in August 2012. Compl. ¶¶ 130-139. At this stage, these allegations preclude dismissal of the claims against Wilson in this regard.

[112]    Compl. ¶¶ 130-154.

true. In that context, it is at least reasonably conceivable that the individuals who devised and executed that scheme will be liable for breach of the duty of loyalty.[113]

It was during the time period in which those alleged breaches took place that Stawiarski resigned from his position on the RPH Board, "to avoid having to vote on these matters."[114] Stawiarski asserts that the allegations in the Complaint regarding those breaches focus on the Castles and the Wilsons, and fail to state a claim against him in this regard. As with the claims for breach of contract, although Stawiarski might be vindicated on a more developed record, it would be inappropriate at this stage to conclude that it is not reasonably conceivable that he, too, might have breached his fiduciary duties. For example, because he allegedly did not resign and step away from the Company until January 2012, it is possible that RPH's financial collapse was foreseeable even before then and that Stawiarski disloyally acceded to the Castles' and the Wilsons' plan to facilitate its insolvency and repurchase the Services Businesses. If

---

[113]  Defendants' contrary arguments on this point range from merely unpersuasive to frivolous. The strongest such argument they make is that these claims are derivative in nature, and therefore Plaintiff faces several procedural barriers to prosecuting this action. I addressed and rejected those contentions *supra*. Another colorable argument is that the fiduciary duty claims actually arise from the parties' relevant agreements, including the RPH LLC Agreement, and therefore must be dismissed as duplicative of Plaintiff's claims for breach of contract. But, as previously discussed, while the fiduciary duty claims may overlap with the breach of contract claims in certain respects, the fiduciary duty claims "depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy." *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008). I therefore decline to dismiss the fiduciary duty claims as "superfluous." Wilson Defs.' Opening Br. 13. None of the other related arguments raised by the Individual Defendants has merit.

[114]  Compl. ¶ 132.

he were aware of those designs, it conceivably could have been a breach of his fiduciary duties to have done nothing other than resign from the Board.[115]  For at least that reason, I conclude that the claims for breach of fiduciary duty cannot be dismissed as to Stawiarski.

**B.      Plaintiff States Claims Against Some Defendants for Aiding and Abetting**

Plaintiff charges all Defendants with aiding and abetting the alleged breaches of fiduciary duty in Count III.  To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach.[116]  In this case, Plaintiff has met this pleading standard as to almost all Defendants.

As an initial matter, having found that Plaintiff has stated claims for breach of fiduciary duty against the Castles, Stawiarski, and the Wilsons, I question whether Plaintiff also can sue those Defendants on an aiding and abetting theory.  Delaware cases dealing with claims for aiding and abetting a breach of fiduciary duty have held that, as a matter of law, aiding and abetting liability generally cannot attach to defendants who

---

[115]      *See, e.g.*, *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *24 (Del. Ch. May 21, 2013) ("At a later stage of the case, I will take into account [the defendant directors'] resignations, which could well serve to limit their potential liability for events described in the Complaint that post-date their board service.") (citing *In re Puda Coal, Inc. S'holders Litig.,* C.A. No. 6476-CS, at 15-17 (Del. Ch. Feb. 6, 2013) (TRANSCRIPT)).

[116]      *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

themselves owe fiduciary duties to the relevant entity and plaintiff.[117] The reason is that wrongful conduct on the part of the defendant fiduciary simply would give rise to direct liability for a breach of the duties he owes, rather than secondary liability on the theory of aiding and abetting.[118] Those principles militate in favor of dismissing the aiding and abetting claims in Count III as to the Defendants who indisputably owed fiduciary duties to RPH and its Members—namely, Lawrence Castle and Stawiarski, as members of the Board of Managers, and Wilson-Harvey, as the Company's CEO. The existence of a fiduciary relationship may be less apparent in the cases of Caren Castle and Wilson, but as discussed *supra*, it is reasonably conceivable that those two individuals also may be liable for breach of fiduciary duty.

Thus, I conclude that Plaintiff's aiding and abetting claims against Lawrence Castle, Stawiarski, and Wilson-Harvey are technically flawed as a matter of law, and must be dismissed. The same alleged facts as to those Defendants, however, may provide

---

[117] *Id.* ("A *third party* may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach.") (emphasis added); *see also Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) (aiding and abetting liability "requires . . . a knowing participation in that breach by the defendants who are not fiduciaries."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990) ("It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. . . . [Among the necessary elements is] knowing participation in that breach by the party not in direct fiduciary relationship."); *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972).

[118] *See, e.g.*, *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *13 (Del. Ch. Nov. 3, 2014) (citing *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009)).

additional grounds for finding they breached a fiduciary duty owed to Plaintiff.  Although the same ultimately may be true of the aiding and abetting claims against Caren Castle and Wilson, I nevertheless conclude that it would be premature to dismiss Count III as it relates to them.  The reason is that if they ultimately are found not to have owed fiduciary duties and Plaintiff's fiduciary duty claims fail as to them, they still could be subject to liability as aiders and abettors.[119]  Thus, based on the facts discussed previously, it is reasonably conceivable that those two Defendants knowingly participated in breaches of fiduciary duty allegedly committed by the other Individual Defendants.

As for LEC, LCS, Castle Law Group, Next Org, W&A, and AMS, I find it reasonably conceivable, taking the allegations in the Complaint as true, that each of them could be liable for aiding and abetting the breaches of fiduciary duty allegedly committed by the Castles, Stawiarski, and the Wilsons.  All of these Defendant entities are alleged to be owned by or affiliated with the Individual Defendants.  Just focusing on the alleged scheme to push the Company into insolvency and then buy the Services Businesses from the receiver, it is conceivable that each of those entities knowingly participated in that scheme.  For example, it was through LEC that the Castles allegedly took the challenged actions vis-à-vis RPH, because they only held RPH units indirectly through LEC.  A reasonable inference arises that LCS served a similar role with respect to Stawiarski.  The law firm Defendants, W&A and Castle Law Group, were the loci of the Services

---

[119]    *See Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (allowing plaintiff to bring aiding and abetting claims as alternative pleading, in case the defendants accused of aiding and abetting might later be found not to have owed fiduciary duties).

Businesses before RPH acquired them. As such, they presumably would have benefitted from the Individual Defendants' re-assertion of control over the Services Businesses through the alleged manipulation of the Colorado Action. The "knowing participation" of Next Org and AMS is even more patently evident from the face of the Complaint. Those entities, allegedly affiliated with the Castles and Wilson-Harvey, respectively, are accused of having served as the Individual Defendants' straw buyers in the sale by the receiver. This Court has found aiding and abetting claims well pled when an entity acts as "middleman for and beneficiary of improper disbursements by" the allegedly faithless fiduciaries with which they are affiliated.[120] Taking all alleged facts as true and drawing reasonable inferences in Plaintiff's favor, I find that it is reasonably conceivable that each of LEC, LCS, Castle Law Group, W&A, Next Org, and AMS acted as middlemen for the Individual Defendants in connection with the disloyal plot they allegedly carried out. Thus, I deny the motions to dismiss this aspect of Plaintiff's aiding and abetting claims.

### C. Plaintiff States Claims Against Defendants for Civil Conspiracy

In Count V, Plaintiff brings a claim for civil conspiracy against all Defendants. "Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts supporting: (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the

---

[120] *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15 (Del. Ch. Nov. 21, 1995).

conspirators caused actual damage to the plaintiff."[121]  Defendants join in contending that, because all of Plaintiff's other causes of actions are insufficient, there is no well-pled allegation of an "unlawful act," and for that reason the civil conspiracy claims must be dismissed.  As discussed above, Plaintiff adequately has stated claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and aiding and abetting breaches of fiduciary duty.  Thus, Defendants' principal argument provides no basis for dismissal of the civil conspiracy claim.

The Castle Defendants additionally argue that Plaintiff's allegations as to the "meeting of the minds" element are fatally non-specific.  "Even to prevail at trial," however, a plaintiff does "not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators.  And to survive a motion to dismiss, all that is needed is a reasonable inference that [the defendant in question] was part of this conspiracy."[122]  I find that the Complaint alleges that the Castle Defendants were part of the alleged conspiracy.  Thus, their argument in this regard is unavailing.  It is reasonably inferable from the non-conclusory facts alleged in the Complaint that Defendants formed a "confederation," conducted unlawful acts in

---

[121]   *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).

[122]   *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009) (citing *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006) ("To prove a conspiracy, however, it is not necessary that there be an express agreement.  What is necessary is evidence of a combination between two or more persons, followed by an unlawful act carried out in furtherance of such combination, and damages.")), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

57

furtherance of the conspiracy, and caused actual damages to Plaintiff. Count V for civil conspiracy, therefore, is well-pled as to all Defendants. [123]

## VI. COUNT VII

Plaintiff's final Count charges all Defendants with fraudulent transfer under the Delaware Uniform Fraudulent Transfers Act ("DUFTA").[124] As support for this claim, Plaintiff points to the alleged underpayment of fees to RPH and the allegedly wrongful receivership sales of the Services Businesses.[125] Plaintiff contends that those transfers actually were, or reasonably appear to have been, made purposefully to hinder Plaintiff's interest as a holder of RPH equity and debt, for less than reasonably equivalent value,

---

[123] I emphasize that the arguments actually advanced by Defendants do not support dismissal of Plaintiff's civil conspiracy claim. In reaching this conclusion, however, I recognize that there may be other grounds to challenge that claim. For example, the preceding section explained that Delaware law generally does not permit a claim against a fiduciary for aiding and abetting a breach of fiduciary duties, because liability in such a situation would be primary (*i.e.*, an actual breach of fiduciary duty), not secondary (*i.e.*, aiding and abetting such a breach). Conspiracy and aiding and abetting are both secondary bases of liability and, in several ways, are related concepts. *See, e.g.*, *Carlton Invs.*, 1995 WL 694397, at *15. Because Defendants did not adequately present the issue, I do not address whether Delaware law might recognize a claim of conspiracy among fiduciaries to breach fiduciary duties, a situation arguably implicated here. That this alleged conspiracy potentially includes both fiduciaries and non-fiduciaries only adds further nuance not addressed by Defendants. Similarly, issues exist regarding whether a breach of contract can form the basis of a civil conspiracy claim. *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) ("A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim."). *See* discussion in text and note 73, *supra*.

[124] 6 *Del. C.* §§ 1301-1312.

[125] Pl.'s Answering Br. 70; Compl. ¶¶ 229-240.

58

while RPH was in financial distress. Thus, Plaintiff asserts that it has stated claims for actual and constructive fraud under 6 *Del. C.* §§ 1304-1305.

Defendants' several arguments in favor of dismissing Plaintiff's claims for fraudulent transfer are without merit. First, the Wilson Defendants argue that this claim improperly is asserted against Defendants instead of the debtor, RPH. Second, the Castle Defendants contend that the time period for bringing claims under DUFTA has lapsed. Both of those arguments, however, ignore the plain text of the statute. That language allows judgments to be entered against transferees,[126] which Defendants are alleged to be, and deems claims timely if they are brought within one year of discovery or four years of the date of the wrongful transfer, whichever is later.[127] Here, the claims for fraudulent transfer were brought in March 2014. The Complaint accuses Defendants of engaging in a number of wrongful transfers leading up to and including the alleged scheme to push RPH into insolvency, which occurred less than four years earlier (*i.e.*, in or after March 2010).

Defendants also assert that to the extent the wrongful transfer was the transfer of "services" by RPH, those services cannot qualify as "property" that would be subject to DUFTA. That argument erroneously narrows the scope of Plaintiff's allegations. The statute prohibits fraudulent "transfers," defined to mean every mode of "disposing of or

---

[126]    6 *Del. C.* § 1308(b)(1)-(2); *id.* § 1307(a)(2).

[127]    6 *Del. C.* § 1309(1).

parting with an asset or an interest in an asset."[128]  An "asset" is broadly defined to be "property of the debtor," which in turn is broadly defined as "anything that may be the subject of ownership."[129]  Plaintiff persuasively argues that to the extent RPH rendered services for which Defendants improperly failed to remunerate it, those services gave rise to contractual rights to receive payment, which are "traditional property right[s]."[130]  As a separate basis for this conclusion, I note that Plaintiff's fraudulent transfer claims are not predicated solely on the allegedly wrongful transfers relating to the payment of fees for services during RPH's operational life time.  The claims also relate to the alleged scheme by which certain Defendants manipulated the insolvency and foreclosure of RPH to facilitate their re-purchase of the Services Businesses—which clearly are "assets"—on the cheap.  Defendants put forth no cogent argument as to why, assuming the truth of those allegations, they do not give rise to a legally sufficient claim for fraudulent transfer.

Finally, Defendants contend that because some or all of the allegedly fraudulent transfers also might give rise to a claim for breach of the relevant agreements between the parties, the fraudulent transfer claims are subsumed by Plaintiff's contract claims. Defendants did not develop this argument well in their briefing and it does not provide the Court with sufficient grounds for dismissing Count VII.  This is especially true in

---

[128]  *Id*. § 1301(12).

[129]  *Id*. § 1301(2), (10).

[130]  *Abdul-Akbar v. Corr. Med. Sys., Inc.*, 1991 WL 50151, at *4 (Del. Ch. Mar. 22, 1991) (noting that, in the context of a due process analysis, the test for deprivation of a protected interest "is easily met when traditional property rights are involved (an interest in land for example, a debt or a contract right).").

60

light of DUFTA's express statement that, "Unless displaced by the provisions of this chapter, the principles of law and equity . . . supplement its provisions."[131] I cannot conclude, therefore, at this procedural stage that it is inconceivable Plaintiff would be able to recover against Defendants under the fraudulent transfer statute.

## VII. CONCLUSION

For the foregoing reasons, Counts I and IV are dismissed as they relate to Defendant Caren Castle. Count II is dismissed as it relates to Defendants LEC and LCS. Count III is dismissed as to Defendants Lawrence Castle, Stawiarski, and Wilson-Harvey. In all other respects, Defendants' Motions are denied.

**IT IS SO ORDERED**.

---

[131]     6 *Del. C.* § 1310.

61